IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMMANUIL KAIDANOV, | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA STATE UNIV., *et al.*, | : | NO. 14-3191 |
|     Defendants. | : | |

## MEMORANDUM

PRATTER, J.                                                                                                                                                                                                     DECEMBER 23, 2014

      Fencing coach Emmanuil Kaidanov challenges the decision of Pennsylvania State University ("Penn State") to terminate his employment, bringing claims against Penn State and two of Penn State's employees under both federal and state law.  Mr. Kaidanov maintains that in contravention of an employment contract with Penn State, he was terminated without good cause.  Defendants now move to dismiss each count in Mr. Kaidanov's Complaint.  The Court held oral argument on the motion on November 15, 2014 and will grant in part and deny in part Penn State's motion for the reasons that follow.

### BACKGROUND

      Emmanuil Kaidanov was Penn State's men's and women's fencing coach for 31 years, leading the teams to 12 national championships.  Penn State hired Mr. Kaidanov in September of 1982, pursuant to a contract that was renewed annually.  Mr. Kaidanov alleges that his contract was renewed most recently on July 1, 2013, and, although he does not explicitly state that the contract contained a term prohibiting termination without cause, he does allege that because of his contract he could not be terminated without good cause.  During the relevant time period, Defendant David Joyner was Penn State's athletic director, and Defendant Julie Del Giorno was Penn State's "Athletics Integrity Officer."

In February 2013, a female member of the fencing team (hereinafter the "Student") was called to the PSU Police Department and accused of possession of drugs. Pursuant to a policy encouraging anonymous reporting of misconduct in the Athletics Department, Policy AD67,[1] a member of the Athletics Department staff (hereinafter the "Reporter") had reported to University police that she thought she saw the Student drop a "joint." In reality, the Student dropped a piece of white athletic tape and, accordingly, was cleared of any charges. When Mr. Kaidanov learned of the situation, he addressed the issue with the Student and her parents, and encouraged the Student to voluntarily submit to a drug test. The Student did so and passed.

Mr. Kaidanov alleges that he was required to monitor his team's compliance with the "Athletics Integrity Agreement" and NCAA regulations. Thus, he claims that it was his personal and non-delegable responsibility to investigate and make personal inquiries regarding the incident in question, as well as to personally report any suspected violations of University policy. Because of these obligations, he not only addressed the issue with the Student, but also spoke with the Reporter "and expressed his disappointment that the staff member had not informed him of what had happened." He did not express any intention to take further action against the Reporter, nor did he threaten or undertake adverse employment actions against her. He also personally did not have the power to take any adverse employment action with respect to the Reporter, and he did not know at the time that the report had been an anonymous one.

In July 2013, Ms. Del Giorno contacted Mr. Kaidanov to arrange a meeting, but refused to tell him beforehand the subject matter that would be discussed. At the meeting, Ms. Del Giorno asked Mr. Kaidanov about the facts and circumstances surrounding the February 2013

---

[1] This Policy covers anonymous reporting of misconduct and prohibits retaliating against employees who report misconduct in the Athletics Department. Retaliation is specifically defined by this Penn State policy as including harassment, among other adverse actions.

incidents, both as to the Student and the Reporter.[2] This was the first time that Mr. Kaidanov learned that the Reporter had made her report anonymously, pursuant to Policy AD67. According to the Complaint, at no time during this meeting did anyone raise the issue of discipline based on the incident.

Sometime after this meeting, Dr. Joyner asked Mr. Kaidanov to come to his office for a meeting on August 20, 2013. Dr. Joyner did not inform him what the meeting would be about prior to that date. The meeting was attended by Mr. Kaidanov, Dr. Joyner, and Ms. Del Giorno.[3] At the meeting, Dr. Joyner informed Mr. Kaidanov that he had "lost confidence" in him and accused him of retaliating against the Reporter, in violation of Policy AD67. He then terminated Mr. Kaidanov's employment. A letter from Dr. Joyner dated that same day lists a number of reasons for Mr. Kaidanov's dismissal. Mr. Kaidanov claims that all of the reasons were pretextual. Mr. Kaidanov also claims that he did not have proper notice of the charges against him or a meaningful opportunity to respond before he was actually terminated, despite the description of the meeting in Dr. Joyner's letter which states that Dr. Joyner presented Mr. Kaidanov with various facts regarding the Reporter incident and the University policies implicated and gave him a chance to respond to each issue raised. At some point, either at the July or August meeting, Mr. Kaidanov cited a disagreement with Policy AD67; however, he claims that he said he would follow the policy and had always followed it.[4]

---

[2] HR employee Robert Maney also attended this meeting, according to documents attached to the Complaint.

[3] According to documents attached to the Complaint, HR employees Troy Fisher and Robert Maney also attended this meeting.

[4] There is some disagreement about whether he said that he would not follow AD67, but that disagreement is fodder for a later motion or for trial, not for a motion to dismiss.

A grievance hearing was held on September 27, 2013 before Dovizia Long, a manager of Employee Relations at Penn State. Mr. Kaidanov claims that although this meeting was ostensibly an opportunity for Ms. Long to hear evidence supporting his termination and Mr. Kaidanov's rebuttal to that evidence, it was merely a "rubber-stamp" approval of Dr. Joyner and Ms. Del Giorno's actions. The evidence presented by Dr. Joyner consisted solely of the reading of his August 20, 2013 letter. At the hearing, the parties disagreed about the interaction between Penn State's reporting policies and the NCAA requirements of coaches. The hearing resulted in an October 10, 2013 letter from Ms. Long adopting Dr. Joyner's decision. That letter states that Mr. Kaidanov was given an opportunity to (and did) present documentary evidence to support his side of the story, and that a university professor attended the hearing with him. Mr. Kaidanov, however, claims that he was precluded from presenting relevant rebuttal information at that time regarding statements of his "good name, character, integrity, and reputation." After his termination, the University publicized that he had been terminated for "personnel reasons."

On June 5, 2014, Mr. Kaidanov filed this Complaint, setting out seven claims. The first three claims all invoke 42 U.S.C. § 1983. Count I charges the Individual Defendants with violating Mr. Kaidanov's rights to procedural due process by failing to provide adequate pre- and post-termination process. Count II charges Penn State with the same violations. Count III charges all Defendants with violating Mr. Kaidanov's liberty interest in his reputation (a "stigma-plus" claim). The remaining claims are state law claims: a claim for tortious interference with contract against the Individual Defendants (Count IV), a claim for wrongful termination against all Defendants (Count V), a claim for breach of contract against all Defendants (Count VI), and a claim for false light against all Defendants (Count VII). The Defendants now move to dismiss all of the claims against them.

**LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *id.*

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (citation and internal quotation marks omitted). Thus, assessment of the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir.

2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). Also, the Court must accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to the nonmoving party. *See Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). That admonition does not demand that the Court ignore or disregard reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citations and internal quotation marks omitted), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions" (citations omitted)). Finally, "if a [claim] is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

### DISCUSSION

Mr. Kaidanov has agreed to withdraw Count I in its entirety, as well as Counts III, V, and VI as to the Individual Defendants only, therefore, the following discussion addresses only the remaining counts.

### A. *Due Process (Count II)*

To state a claim for pre- or post-termination due process deprivation, a plaintiff who is a public employee must plead that he or she had a property interest in his or her continued employment, and that he or she was deprived of that property interest without "notice and opportunity for hearing appropriate to the nature of the case." *See Biliski v. Red Clay Consol. Sch. Dist. Bd. Of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009). "To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have legitimate entitlement to such continued employment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006).

Once the threshold question of property interest has been answered, a court must determine whether a plaintiff received due process. "It is by now well established that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. [D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Biliski*, 574 F.3d at 220 (internal quotations and citations omitted). In determining whether due process was afforded a plaintiff, a court must consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In the employment context, a pre-termination hearing "need not be elaborate." *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985). As long as adequate post-termination procedures are available, all that is required is "notice of the charges against [the employee], an explanation of the employer's evidence, and an opportunity to present [the employee's] side of

the story." *Id.*   Notice of the charges prior to the *Loudermill* hearing itself is not required, so long as the timing of the notice does not prevent the employee from responding to the charges. *Gniotek v. Philadelphia*, 808 F.2d 241, 244-45 (3d Cir. 1986).  A post-termination hearing must be held at a "meaningful time," *i.e.*, promptly, given the circumstances of the case. *Loudermill*, 470 U.S. at 547.  The post-termination hearing must also be held before a "neutral tribunal . . . that can resolve charges of improper motives" at the pre-termination stage. *McDaniels v. Flick*, 59 F.3d 446, 459 (3d Cir. 1995).

    *1. Property Interest*

Defendants first argue that Mr. Kaidanov has not adequately pleaded a property interest in continued employment.  They argue that Mr. Kaidanov has not sufficiently alleged that he had an employment contract and that he failed to allege that he had a contract that contained a term preventing termination without cause.[5]  They point to case law that states that employment at-will generally is presumed. *See, e.g., Permeter v. Crown Cork & Seal Co., Inc.*, 38 F. Supp. 2d 372, 377 (E.D. Pa. 1999), *aff'd,* 210 F.3d 358 (3d Cir. 2000).

Defendants cite *Chinoy v. Pa. State Univ.*, Civil No. 11-CV-01263, 2012 WL 727965 (M.D. Pa. Mar. 6, 2012) for the proposition that a non-tenured employee has no property interest in her employment without a contract that specifies that termination must be for good cause.  In *Chinoy*, a non-tenured professor at Penn State sued under § 1983, claiming that her due process rights were violated when she was terminated in December, 2009.  In her amended complaint, the plaintiff alleged that she had a property interest in her employment, but she did not allege any further details as to why she had such an interest.  The defendants moved to dismiss her amended complaint, arguing that she had failed to sufficiently allege a property interest in her employment. *Id.* at *1-2.  In response to the defendants' motion, the plaintiff proffered two

---

[5] Naturally, these arguments go to the validity of some of Mr. Kaidanov's state law claims, as well.

contracts, neither of which contained a term requiring termination for good cause and both of which had expired well before her termination. *Id.* at *4. The *Chinoy* court held that because there was no term in the contracts that allowed termination for good cause only, the plaintiff had no property interest in her employment, and that, in any case, the contracts had expired before she was terminated, which meant that at the time of her termination, she was an at-will employee. *Id.*

*Chinoy* is readily distinguishable from this case. In Mr. Kaidanov's Complaint, he alleges that he had an employment contract with Penn State that was renewed on a yearly basis from the time he was hired in 1982 and that the contract had most recently been renewed just before his termination. Although he does not directly plead the terms of the agreement, he does allege in paragraph 17 of his Complaint that, "Coach Kaidanov was mid-contract with Penn State at the time of his wrongful discharge, not an at-will employee, and could not be terminated without a good-faith showing of just cause, good-faith enforcement of all applicable University policies consistent with law, and a pre-termination *Laudermill* [sic] hearing." While that sentence does not directly state that his alleged contract required just cause for termination, that fact can be inferred from the sentence. Moreover, as to the contract's essential terms, viewing the Complaint in the light most favorable to the Plaintiff, as the Court must at this stage, it can be inferred from the facts Mr. Kaidanov does plead that the contract he speaks of was a contract for employment as a coach of Penn State's fencing teams that was to be renewable on a yearly basis and that could be terminated only for good cause. Thus, unlike the plaintiff in *Chinoy*, Mr. Kaidanov does allege that he had a contractual relationship with Penn State that had not ended prior to his termination, and that he could only be terminated for good cause.[6] Mr. Kaidanov,

---

[6] Mr. Kaidanov attaches to his Complaint some examples of what he calls contract renewal letters. These letters say nothing about renewing a contract or an agreement; they simply state what Mr. Kaidanov's

then, has just barely alleged an express employment contract that prevented his termination without good cause. Thus, the Court will not dismiss Mr. Kaidanov's due process claim on this ground.[7]

### 2. *Pre- and post-termination hearings*

In addition to attacking Mr. Kaidanov's due process claims by arguing that he did not have a property interest in his employment, Defendants argue that they provided him with all the pre- and post-termination process he was due. Defendants focus on the content of the letters attached to the Complaint that were written by Penn State employees describing the pre- and post-termination hearings with Mr. Kaidanov, and they largely rely on them when they argue that Mr. Kaidanov received due process. While the allegations in Mr. Kaidanov's Complaint are less than detailed, in that they simply state that he was unable to adequately respond or that he did not receive proper notice without stating any specific factual examples of how Penn State could have

---

salary would be for the upcoming year. The letters, rather than bolster his contract allegations, seem to undermine them, in that he is calling them "contract renewal letters" when they fail to even mention or hint at a contract. Without a copy of the original contract, however, it is not possible to determine the precise significance of these letters beyond what is expressly stated in them.

[7] While Mr. Kaidanov does not expressly plead that he had an "implied" contract with Penn State, he claims that even if he failed to plead an express contract, he has pleaded an implied contract. "[T]he presumption of at-will employment may be overcome by a showing that the employee provided additional consideration to the employer and that termination of employment would result in great hardship or loss to the party known to both employer and employee when the contract was made." *Natale v. Winthrop Resources Corp.*, Civil Action No. 07-4686, 2008 WL 2758238, at *7 (E.D. Pa. July 9, 2008) (citing *Permenter,* 38 F. Supp. 2d at 379). The standard example is when an employee relocates a great distance to accept a job offer. Mr. Kaidanov claims to have met this standard by pleading that he was a highly successful NCAA coach, that he had recruited athletes and otherwise prepared for the upcoming fencing season, which was about to be underway when he was terminated. He claims that his status as an NCAA coach creates an implied yearly contract, as it would be highly detrimental to both a coach such as himself and the university's team to have a change in coaching mid-season. Furthermore, he claims that because he gave "additional consideration" in the form of recruiting a team, preparing for the season, and holding summer fencing camps, he had at least an implied contract with Penn State. He also argues that because he could not find a new coaching job at the time he was fired because it was too close to the start of the season, that fact counts as "additional consideration" sufficient to support the existence of an implied contract. Because the Court finds that Mr. Kaidanov has pleaded an express contract, there is no present need to decide whether he has successfully pleaded an implied contract.

done things differently to comport with due process, they do at least demonstrate a disagreement with the description of the hearings found in the letters attached to the Complaint. Thus, Defendants' reliance on the *factual* statements in the letters as demonstrating compliance with due process obligations is misplaced, in that Mr. Kaidanov is *not* presenting those letters as supplementary factual allegations.

As for pre-termination process, Defendants argue that at the August meeting, Mr. Kaidanov was informed, and, hence, presumably should have been on guard as it were, that he was accused of retaliating against the Reporter, that Policy AD67 was at issue, and that he was going to be terminated. They also argue that he was given an opportunity to present his side of the story at that time. Mr. Kaidanov focuses on the fact that he did not receive notice of the charges *prior to* the August meeting, but it is well-settled in this Circuit that notice of the charges prior to the *Loudermill* hearing itself is not required, so long as the timing of the notice does not prevent the employee from responding to the charges. *Gniotek*, 808 F.2d at 244-45. Mr. Kaidanov does not cite to any case law that states otherwise. Mr. Kaidanov does allege, however, that he was not given an appropriate opportunity to respond to the charges against him. While the letter from Dr. Joyner that is attached to the Complaint suggests that Mr. Kaidanov was given ample opportunity to respond to each point raised, Mr. Kaidanov, as noted above, does not agree with Dr. Joyner's summary of the events.

As to the post-termination proceeding, Mr. Kaidanov argues that the Defendants did not present any evidence of "retaliation," and that the only way to rebut Dr. Joyner's statement that he had "lost confidence" in Mr. Kaidanov would have been to present statements at the hearing of other coaches, staff, and athletes. He also claims that Ms. Long was not a neutral party. He does not cite any cases that state that he was entitled at the hearing to confront the Reporter in

11

person, or that evidence in the form presented (*i.e.*, Dr. Joyner reading the charges against him) was not sufficient, or that due process required that he be able to present witnesses. Mr. Kaidanov does allege that he was not allowed to "present statements of [his] good name, character, integrity, and reputation," but it is unclear whether that means that he was simply not allowed to bring character witnesses to the hearing, or that he was prohibited from presenting that type of evidence altogether (*i.e.*, that he was prevented from even presenting documentary evidence such as a letter from a fellow coach, etc.).

Although his allegations may be less than detailed, Mr. Kaidanov has at least put Penn State on notice of the claim against them and of his attendant defenses, and the Court agrees that if he was not presented with an adequate opportunity to respond to the charges against him at either or both of the proceedings, he was not afforded due process. Moreover, to the extent Mr. Kaidanov claims that Ms. Long was biased, and therefore not an impartial decision-maker, he may also have a claim for violation of post-termination due process. While the claim for deprivation of pre- and post-termination due process may not survive a summary judgment motion, Mr. Kaidanov has alleged just enough to get beyond a motion to dismiss.

### B. "Stigma-Plus" Claim (Count III)

Mr. Kaidanov argues that Defendants violated his constitutional rights by making false reports about his termination, thus undermining his liberty interest in his reputation. To plead such a "stigma-plus" violation, in addition to a "plus factor" (here, termination), a plaintiff must allege (1) a publication (2) of a substantially materially false statement (3) that infringed upon his or her "reputation, honor, or integrity." *Howard v. Pa. Dep't of Pub. Welfare*, No. CIV. A. 11-1938, 2013 WL 102662, at *14 (E.D. Pa. Jan. 9, 2013). The only publication Mr. Kaidanov points to is a statement made by the University that Mr. Kaidanov's termination was a

"personnel matter." He claims that in the wake of the Sandusky scandal such a statement invited "rampant and unfounded speculation" by the public. However, even in the post-Sandusky world of Penn State's Athletic Department, an innocuous and generalized statement such as the one alleged here could not be interpreted as materially false or infringing upon "reputation, honor, or integrity," without an enormous and unwarranted lunge into the realm of speculation. Thus, the Court will dismiss Mr. Kaidanov's "stigma-plus" claim.

### C. Tortious Interference with Contract (Count IV)

Individual Defendants argue that because they were agents of Penn State, they cannot be liable for interfering with any contract between Mr. Kaidanov and Penn State. *See Daniel Adams Assoc., Inc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1001-02 (Pa. Super. 1987) ("[W]here, as here, a plaintiff has entered into a contract with a corporation, and that contract is terminated by a corporate agent who has acted within the scope of his or her authority, the corporation and its agent are considered one so that there is no third party against whom a claim for contractual interference will lie."). They also argue that they were justified in their actions because they followed University policy and that there was no contract with which they could interfere.

Mr. Kaidanov argues that the Individual Defendants could be liable for tortious interference with contract, relying on one Pennsylvania Superior Court case that he claims suggests this possibility. *See Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Div.*, 422 A.2d 611, 619 (Pa. Super. Ct. 1980). In his argument, however, Mr. Kaidanov takes a statement made in the court's discussion of a wrongful termination claim completely out of context and uses that statement as the basis of his argument. Contrary to Mr. Kaidanov's interpretation of the case, the Pennsylvania Superior Court in *Yaindl* was not concluding that an employee could be held liable for intentional interference with contractual relations when another employee is

13

terminated. Rather, the court was drawing an analogy between wrongful discharge and intentional interference with contractual relations and positing that wrongful discharge claims are analytically similar to intentional interference claims if one views the employer, the discharged employee, and the employee performing the termination as three separate people. *See id.* Indeed, in the very same case, in addition to a wrongful termination claim, the plaintiff asserted a claim for intentional interference with prospective contractual relations, arguing that employees from one division of the defendant-company allegedly interfered with the terminated plaintiff's prospective employment relationship with another division of the company. When refusing to dismiss that count, the court held that those two divisions were, in essence, different people for purposes of the tort, and did not relax the usual rule that a corporation and its agent are one and the same in counting out the three individuals necessary to make out an intentional interference claim. *Id.* at 624-25. Here, there are no such allegations of multiple divisions that could be treated as separate companies. The Court will not use such weak case law to deviate from the well-settled rule that agents of a company cannot tortiously interfere with a contract between that company and a fellow employee and will therefore dismiss this claim.

### D. *Wrongful Termination (Count V)*

Defendants argue that Mr. Kaidanov has failed to state a claim for wrongful termination because he has not pointed to any public policy which was violated by his discharge. They cite cases giving examples of public policies sufficiently important to support such a claim, including filing a worker's compensation or unemployment claim, reporting an OSHA violation, or otherwise engaging in protected activity. *See, e.g., McLaughlin v. GastroIntestinal Specialists*, 750 A.2d 283 (Pa. 2000); *Shick v. Shirey,* 716 A.2d 1231, 1234 (Pa. 1998); *Highhouse v. Avery Transp.*, 660 A.2d 1374 (Pa. Super. Ct. 1995).

Mr. Kaidanov counters by arguing that because he was not an at-will employee, his discharge during his contract term was wrongful. However, while that argument might support a breach of contract claim, it directly undermines his wrongful discharge claim. *See, e.g., Phillips v. Babcock & Wilcox*, 503 A.2d 36, 38 (Pa. Super. 1986) ("Therefore, because the wrongful discharge action in Pennsylvania was judicially created to protect otherwise unprotected employees from indiscriminate discharge and to provide unorganized workers a legal redress against improper actions by their employers, we hold that an action for the tort of wrongful discharge is available *only* when the employment relationship is at will.") (emphasis added).

Even assuming Mr. Kaidanov has pleaded this claim as an alternative to his breach of contract claim, however, Mr. Kaidanov has not sufficiently alleged that his termination violated public policy. According to the Pennsylvania Supreme Court, in determining whether a particular policy is the public policy of the Commonwealth for purposes of a wrongful discharge claim

> [i]t is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal.

*Shick*, 716 A.2d at 1235 – 1236.

Mr. Kaidanov argues that he was fired for following NCAA rules and that those rules constitute public policy. He cites no case law that would suggest that NCAA rules or the rules of a similar private entity are considered public policy by the Commonwealth of Pennsylvania. This Court also failed to find any Pennsylvania cases equating NCAA rules with public policy. However, a federal district court in South Carolina has specifically held that NCAA rules were *not* public policy. *Walters v. Benedict College*, No. 3:04-0952-JFA, 2006 WL 644442, at *9

15

(D.S.C. Mar. 10, 2006).  Because the Court will not hold that the rules and policies of a private body can represent the public policy of the Commonwealth, particularly under the very sharp tipped narrow-focus definition set forth by the Pennsylvania Supreme Court in *Shick*, Mr. Kaidanov's wrongful termination claim will be dismissed.

### E.  Breach of Contract (Count VI)

Defendants argue that Mr. Kaidanov has failed to plead the existence of a contract and that his breach of contract claim must therefore fail.  For the same reasons that the Court has held that Mr. Kaidanov successfully pleaded a contract and, consequently, a property interest in employment for purposes of his due process claim, the Court will not dismiss Mr. Kaidanov's breach of contract claim.

### F.  False Light (Count VII)

"Pennsylvania has adopted the definition of false light invasion of privacy from the Restatement (Second) of Torts, which imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'"  *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Larsen v. Phila. Newspapers, Inc.,* 543 A.2d 1181, 1188 (Pa. Super. 1988) (en banc)). Defendants argue that the only thing they ever publicized about his termination was that Mr. Kaidanov was fired for confidential, personnel reasons, and they contend that this could not possibly give rise to a false light claim.

Mr. Kaidanov counters by arguing that by only saying that he was fired for personnel reasons, he was painted in a false light by inviting speculation as to grounds for his termination. He cites case law that generally states that selectively publishing facts that create a false impression is actionable, *see, e.g., Graboff*, 744 F.3d at 136-37 ("even where a publication is

literally true, discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed.") (internal quotation omitted), but nothing that would go so far as to hold that revealing essentially no details is actionable.  Thus, for the same reasons Mr. Kaidanov's "stigma-plus" claim fails, as explained above, so too must his false light claim fail.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss will be granted in part and denied in part.  Counts I, III, IV, V, and VII will be dismissed in their entirety.  Count VI will be dismissed as to the Individual Defendants only.  Counts II and VI will not be dismissed as to Penn State.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge